

## NUMBER 13-13-00721-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

MADHAVAN PISHARODI, M.D.,
INDIVIDUALLY AND MADHAVAN
PISHARODI, M.D., P.A., D/B/A
PISHARODI CLINIC,                                                  Appellants,

v.

MARIO SALDAÑA, NANCY LAMAS,
AND JESUS LAMAS,                                                   Appellees.

### On appeal from the 445th District Court
of Cameron County, Texas.

## MEMORANDUM OPINION

**Before Justices Garza, Benavides, and Longoria**
**Memorandum Opinion by Justice Benavides**

This appeal arises out of a medical malpractice case that was tried to a jury

following fifty-four-year-old Micaela Lamas's death. Jurors found appellant Madhavan

Pisharodi, M.D. ("Dr. Pisharodi") sixty percent liable for Micaela's death and awarded appellees, Micaela's surviving children, Mario Saldaña, Nancy Lamas, and Jesus Lamas, $175,000 in medical expenses and $12,000 in funeral and burial expenses. The trial court entered a judgment in appellees' favor for a total amount of $227,986.80, including prejudgment interest, against Dr. Pisharodi and Madhavan Pisharodi, M.D., P.A. doing business as Pisharodi Clinic ("Pisharodi Clinic"), jointly and severally.

By seven issues, which we address as four, Dr. Pisharodi and Pisharodi Clinic assert that: (1) the trial court erred by entering judgment against Dr. Pisharodi because the statute of limitations barred the present suit against him; (2) insufficient evidence existed to support entering judgment against Pisharodi Clinic, and to support the jury's verdict finding Dr. Pisharodi liable; (3) the trial court abused its discretion by allowing Ruth Kohlmeier, M.D. and Stephanie Jones, M.D. to testify; and (4) the trial court reversibly erred by allowing lay witness Samuel Esparza to testify. For the following reasons, we affirm the trial court's judgment.

## I. BACKGROUND

Dr. Pisharodi served as Micaela's neurosurgeon from February 2007 until shortly before her death in November 2007. Dr. Pisharodi's care related to the treatment of pain that Micaela experienced in her lower back. Dr. Pisharodi testified that after Micaela underwent unsuccessful physical therapy to alleviate the pain in her lower back, he recommended an epidural pain block/epidural steroid injection in the L4-L5 level of her spine as an alternative to surgery.

2

On March 27, 2007, Dr. Pisharodi performed the epidural steroid injection procedure on Micaela using a combination of medication composed of depo medrol, a steroid, Marcaine, a local anesthetic, and Duramorph, a type of morphine.

After the March 27, 2007 procedure, Micaela returned to Dr. Pisharodi's office still complaining of pain. As a result, on May 31, 2007, Dr. Pisharodi performed a posterior lumbar decompression at L1 and L2, with diskectomy, fusion, and instrumentation. Five days after the surgery, Dr. Pisharodi discharged Micaela from the hospital and transferred her to a rehabilitation hospital.

On October 17, 2007, Micaela returned to Dr. Pisharodi and complained again about pain in her lower back. Therefore, Dr. Pisharodi recommended another epidural steroid injection. At 10:15 a.m., on October 29, 2007, Dr. Pisharodi performed the epidural steroid injection on Micaela at his Brownsville office. Micaela's medical records signed by Dr. Pisharodi indicate that the same combination of medication administered in the March 27, 2007 procedure was again used in the October 29, 2007 epidural steroid injection procedure. A short time after the procedure, Dr. Pisharodi left Micaela at his clinic to assist with a surgery at a local hospital. At 11:05 a.m., Dr. Pisharodi received a phone call from his office stating that Micaela was nauseated, restless, and diaphoretic.[1] At this time, emergency medical services were also called to Dr. Pisharodi's office. At 11:15 a.m., the medical records indicate that Micaela attempted to talk and collapsed. At that time, the notes indicate that she had no "palpable pulse," was "unresponsive," and clinic staff commenced cardiopulmonary resuscitation. At 11:20 a.m., EMS personnel

---

[1] Diaphoretic was defined as "sweating."

3

arrived, took over care, and transported Micaela to Valley Baptist Medical Center. Dr. Pisharodi testified that he instructed EMS personnel to not administer the reversing drug, Narcan,[2] to Micaela because she was not given morphine during the procedure. At Valley Baptist Medical Center, the emergency physician noted in the records that Micaela arrived at the hospital with cardiorespiratory arrest, after a "[D]uramorph administration via epidural" at Dr. Pisharodi's office, despite this fact being denied by Dr. Pisharodi at trial.

At the hospital, Micaela's condition stabilized, but she began experiencing seizures in her brain shortly thereafter. Eventually, doctors sedated Micaela to control the seizure activity. On November 2, 2007, Micaela's family requested the transfer of her care to another neurosurgeon, Alejandro Betancourt, M.D. On November 5, 2007, Dr. Pisharodi signed off on the transfer. In his final report, Dr. Pisharodi diagnosed Micaela with "anaphylactic shock following [a] repeat epidural pain block."

In his initial consultation of Micaela, Dr. Betancourt offered the following assessment: "Based upon these findings, I am going perform an apnea test on [Micaela] to be sure that she does not have any brain stem functions. At this moment, she has clinical evidence of brain death. She is not breathing spontaneous by herself." On November 2, 2007, Dr. Betancourt noted that Micaela's overall prognosis was "extremely poor" and that he was awaiting the family's decision on whether to withdraw life support. On November 3, 2007, Dr. Betancourt noted that Micaela suffered "irreversible damage"

---

[2] Narcan was described in the record as a drug administered to reverse the effects of Duramorph and morphine.

4

to her brain and offered no surgical option to her family. Later that day, at the family's direction, Dr. Betancourt disconnected Micaela's life support, and she continued to breathe on her own. On November 4, 2007, Micaela died at Valley Baptist Medical Center, and an autopsy was performed the next day.

Forensic pathologist Ruth Kohlmeier, M.D., performed Micaela's autopsy and concluded that there were no signs of a heart attack leading to Micaela's hospitalization, or of an allergic reaction or anaphylactic reaction to the epidural steroid injection. She opined that Micaela's death resulted from complications of her October 29, 2007 epidural steroid injection. Dr. Kohlmeier further opined that Duramorph "absolutely" played a role in Micaela's death due to it being injected "too deep" into the space surrounding her spine, which "basically got into her central nervous system, into her brain and caused her not to be able to breathe and to cause her heart not to beat properly."

On May 7, 2009, appellees sued Pisharodi Clinic for various acts of negligence related to Micaela's death and sought damages.[3] On August 6, 2012, appellees filed their second amended original petition naming Dr. Pisharodi as an individual defendant in addition to Pisharodi Clinic. Dr. Pisharodi filed a pretrial motion for summary judgment alleging that any claims against him individually were barred by the two-year statute of limitations for health care liability claims, but the trial court denied the motion. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.251(a) (West, Westlaw through 2015 R.S.).

---

[3] Pisharodi Clinic filed an interlocutory appeal in this case, *see Pisharodi v. Saldana*, No. 13-09-0052-CV, 2011 WL 319810, at **1–4 (Tex. App.—Corpus Christi Jan. 27, 2011, pet. denied) (mem. op.), after the trial court denied its motion to dismiss the appellees' case on grounds that their expert report was deficient pursuant to section 74.351 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West, Westlaw through 2015 R.S.); *see also id.* § 51.014(9) (West, Westlaw through 2015 R.S.) (permitting an interlocutory appeal for a denial of a motion to dismiss under Chapter 74).

After an eight-day trial on the merits, with expert witnesses presented by both sides, the jury returned a verdict in favor of appellees finding Dr. Pisharodi sixty-percent liable and Dr. Betancourt forty-percent liable for Micaela's death.[4]  The jury awarded appellees damages in the amount of $175,000 for medical expenses and $12,000 for funeral and burial expenses.[5]  The trial court subsequently entered a final judgment ordering Pisharodi Clinic and Dr. Pisharodi jointly and severally liable for the sum of $187,000 in damages plus prejudgment interest of $40,986.80 for a total amount of $227,986.80.   After the trial court denied all of Pisharodi Clinic and Dr. Pisharodi's post-judgment motions, this appeal ensued.

## II.  STATUTE OF LIMITATIONS

By their first issue, appellants assert that the trial court erred by denying Dr. Pisharodi's motion for summary judgment based upon his limitations defense.

### A.  Standard of Review

The standard for reviewing a summary judgment under Texas Rule of Civil Procedure 166a(c) is whether the successful movant at the trial level carried its burden of showing that there is no genuine issue of material fact and that judgment should be granted as a matter of law.   *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999) (internal citations omitted).   In conducting our review, we take as true all evidence favorable to the nonmovant, and we make all reasonable

---

[4] Dr. Betancourt is not a party to this appeal, but was designated as a responsible third party in the proceeding below.

[5] The jury awarded no damages for appellees' past and future pecuniary loss, past and future loss of companionship and society, past and future mental anguish, as well as no damages for pain and mental anguish and physical impairment suffered and experienced by Micaela as a result of Dr. Pisharodi's actions.

6

inferences in the nonmovant's favor.  *Id.*

A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense.  *Id.*  If the movant establishes that the statute of limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations.  *Id.*

**B.  Discussion**

The statute of limitations for filing a health care liability claim is two years.  *See* TEX. CIV. PRAC. & REM. CODE Ann. 74.251(a).  Dr. Pisharodi contends that the appellees' second amended petition, first naming him as an individual defendant and filed on August 6, 2012, was more than two years past the November 4, 2009 limitations date.

The record is clear and undisputed that appellees named only Pisharodi Clinic as a defendant in their original petition.  Appellees argue, however, that Texas Rule of Civil Procedure 28 and the facts of this case defeat Dr. Pisharodi's arguments in his motion for summary judgment.  We agree.  Rule 28 states:

> Any partnership, unincorporated association, private corporation, or individual doing business under an assumed name may sue or be sued in its partnership, assumed or common name for the purpose of enforcing for or against it a substantive right, but on a motion by any party or on the court's own motion the true name may be substituted.

TEX. R. CIV. P. 28.

The Texas Supreme Court has interpreted this rule to mean that a plaintiff may bring suit against an individual doing business under the name of an association, partnership, or corporation, even if the association, partnership, or corporation does not exist.  *Chilkewitz v. Hyson*, 22 S.W.3d 825, 828–29 (Tex. 1999).  Further, an association, partnership, or private corporation may do business under the name of an

7

individual and may be sued under that assumed name. *Id.* Additionally, the supreme court held that Rule 28 is not a tolling provision when a party is sued in the name under which it conducts business and that party has actual notice of the suit, and it allows suit directly against the correct party in its assumed name. *Id.* at 830. The caveat to Rule 28, however, is "at some point before judgment the plaintiff must amend the petition to add the correct legal name of the actual defendant." *Id.* (citing *Bailey v. Vanscot Concrete Co.*, 894 S.W.2d 757, 760–61 (Tex. 1995)).

The record in this case shows some evidence that Dr. Pisharodi operated under Pisharodi Clinic, as shown by the numerous medical records included as evidence that were signed by Dr. Pisharodi bearing the name "Pisharodi Clinic" with Dr. Pisharodi's name and credentials directly below the stationery's letterhead. Additionally, Micaela's initial patient registration form specifically mentions that she agreed to "pay all medical expenses owed to Dr. M. Pisharodi" if her insurance did not cover her present condition. Finally, the record also shows that Dr. Pisharodi identified himself as a party to this lawsuit and had notice of the suit—before he was individually named as a defendant—in his interlocutory appeal briefing and argument to this Court. *See Pisharodi v. Saldana*, No. 13-09-0052-CV, 2011 WL 319810, at **1–4 (Tex. App.—Corpus Christi Jan. 27, 2011, pet. denied) (mem. op.). Accordingly, there is some evidence from which the trial court could have concluded that Pisharodi Clinic could be and was sued in its "assumed or common name for the purpose of enforcing . . . against it a substantive right," and appellees amended their petition to add the correct legal name of Dr. Pisharodi as an individual. TEX. R. CIV. P. 28; *see also Chilkewitz*, 22 S.W.3d at 829. Dr. Pisharodi and Pisharodi Clinic's first issue is overruled.

8

### III.  SUFFICIENCY CHALLENGES[6]

By their second issue, appellants assert that legally insufficient evidence supports a finding that any employee or agent of Pisharodi Clinic was negligent to hold Pisharodi Clinic liable.   By their fifth and sixth issues, appellants assert that no evidence supported a finding that Dr. Pisharodi breached the standard of care and that conclusive evidence established that Micaela suffered cardiac arrest due to her use of Xanodyne, also known as Darvocet.

### A.  Standard of Review

A legal sufficiency challenge will be sustained when the record confirms either: (a) a complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact.   *City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex. 2005).   In a legal sufficiency review, we must view the evidence in the light most favorable to the verdict.   *See Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (citing *City of Keller*, 168 S.W.3d at 822)).

### B.  Discussion

---

[6] We address these issues together and out of order because we consider rendition-of-judgment issues before considering remand issues.   *See Lone Star Gas Co. v. R.R. Comm'n of Tex.,* 767 S.W.2d 709, 710 (Tex. 1989) (per curiam).

9

### 1. Pisharodi Clinic's Liability[7]

Appellants argue that the record "discloses a complete absence" of evidence to hold Pisharodi Clinic vicariously liable in this case because: (1) the trial court did not submit a jury question as to Pisharodi Clinic's negligence; (2) there is no evidence that Dr. Pisharodi was the owner, employee or agent of the professional association or that any of the staff or nurses were employed by the professional association rather than for Dr. Pisharodi, individually; (3) there is no evidence identifying the employees of Pisharodi Clinic; and (4) there is no evidence "whether . . . [Pisharodi] Clinic was acting through Dr. Pisharodi or anyone else in this case." We disagree.

The Texas Business Organizations Code imposes joint and several liability on a professional association such as the Pisharodi Clinic for an error, omission, negligent or incompetent act, or malfeasance committed by a person who:

> (1) is an owner, managerial official, employee, or agent of the entity; and
>
> (2) while providing a professional service for the entity or during the course of the person's employment, commits the error, omission, negligent or incompetent act, or malfeasance.

TEX. BUS. & ORGS. CODE ANN. § 301.0100(a) (West, Westlaw through 2015 R.S.).

In the appellees' third amended petition, they asserted that Dr. Pisharodi "was operating at all times material hereto under the assumed name of [Pisharodi Clinic]"; alleged various acts of negligence committed by Dr. Pisharodi; and alleged that Dr. Pisharodi "was acting in the course and scope of his employment for [Pisharodi Clinic]"

---

[7] Although appellants assert that "legally and factually insufficient evidence" supports the trial court's judgment against Pisharodi Clinic, appellants only argue "no-evidence" points and ask this Court to render a take-nothing judgment in favor of Pisharodi Clinic. As a result, we will only analyze this issue under a legal sufficiency review.

10

and thus, "Pisharodi Clinic is liable for the negligent conduct of [Dr. Pisharodi] . . . under the theory of vicarious liability."

First, we note that the record contains a signed, pre-trial affidavit by Dr. Pisharodi in which he admits that he is the "owner of [Pisharodi Clinic], named in the above styled lawsuit." Furthermore, as explained previously, the record contains numerous medical records related to Micaela's care that were signed by Dr. Pisharodi on documents bearing "Pisharodi Clinic" and his name and credentials under it. Additionally, throughout Dr. Pisharodi's relevant testimony and discussion of Micaela's care, he continually referred to the clinic as "my office" and did not dispute any references made that he was the owner of the clinic. Lastly, the jury found Dr. Pisharodi negligent in this case.

We find nothing in the pleadings nor in the evidence of this case establishing a distinction between Dr. Pisharodi, acting within the course and scope of his employment as owner of Pisharodi Clinic in his treatment of Micaela, and Pisharodi Clinic. *See Battaglia, P.A. v. Alexander*, 177 S.W.3d 893, 901–02 (Tex. 2005) ("Each professional association had direct liability for the actions of its physician-principal in the course of his employment, and vicarious liability for the actions of its agents and employees in the course of their employment. If the physicians were negligent, the professional associations were likewise negligent, since each association acted only through its physician-principal.") (internal citations omitted).

Accordingly, we conclude that sufficient evidence exists in this record to permit the trial court to impose joint and several liability in its final judgment against Pisharodi Clinic. Appellants' second issue is overruled.

11

## 2. Breached Standards of Care

For a plaintiff to prevail in a medical negligence cause of action, the trier of fact must be guided by the opinion testimony of experts. *McIntyre v. Smith*, 24 S.W.3d 911, 914 (Tex. App.—Texarkana 2000, pet. denied) (citing *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1965). Through expert testimony, the plaintiff must prove: (1) a duty by the physician to act according to a certain standard of care; (2) breach of that standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *Id.* In this case, appellants challenge the legal sufficiency of the evidence related to the second and fourth elements. We will address each in turn.

Appellants first argue that no evidence supports the jury's finding that Dr. Pisharodi breached any standard of care toward Micaela. We disagree. Before delving into the issue of breach, however, we must first examine the appropriate standards of care. Relevant to the evidence presented at trial, appellees alleged in their pleadings that Dr. Pisharodi violated the standard of care by failing to monitor Micaela for respiratory depression after injecting her with Duramorph in his office and failing to timely administer the morphine reversal agent, Narcan. The record shows that these standards of care were established by three witnesses, all of whom were medical doctors. First, Dr. Stephanie Jones, a board certified physician in anesthesiology and pain management, testified that she has performed "probably over 30,000 spinal injections" similar to the ones in this case during her career. According to Dr. Jones, the standard of care calls for the epidural steroid injection procedure, where Duramorph is used, to be performed "in a hospital setting" for safety purposes—specifically, to monitor the patient for "delayed respiratory depression" that can lead to death. Dr. Jones also testified that when a

12

patient suffers from adverse side effects of Duramorph, Narcan should be administered to the patient to reverse the adverse effects of the Duramorph. Next, Dr. Pisharodi, as well as his expert witness, Jordan Smith, M.D., both testified that the standard of care for reversing the adverse side effects of Duramorph, particularly respiratory depression, is to administer Narcan. In summary, the relevant standards of care in this case are: (1) to monitor a patient who has received morphine in an epidural steroid injection, after the procedure to avoid potential death caused by delayed respiratory depression; and (2) to administer Narcan to a patient who experiences the adverse side effects of morphine.

With regard to breach, Dr. Jones testified that Dr. Pisharodi breached two standards of care. First, Dr. Jones stated that Dr. Pisharodi failed to perform the epidural steroid injection with Duramorph in a hospital setting, and as a result, Micaela was not properly monitored when she experienced respiratory depression. Second, Dr. Jones testified that Dr. Pisharodi failed to monitor Micaela for "hours after the injection" to ensure that she did not experience any adverse effects from the Duramorph. Dr. Smith also agreed with appellees' counsel's statement that a doctor or his certified staff should be in the hospital to observe a patient who has received Duramorph, in order to timely administer Narcan, in case of respiratory depression. The evidence shows that Dr. Pisharodi was not present after the administration of the epidural steroid injection and that none of his staff monitoring Micaela on October 29, 2007 were qualified to administer Narcan. Finally, Dr. Pisharodi testified that he told the emergency medical service personnel who responded to his office on October 29, 2007 not to administer Narcan to Micaela because he had not injected her with Duramorph, despite contrary evidence in the evidence that Duramorph was administered from Dr. Pisharodi's own medical records,

13

as well as Micaela's emergency room medical records from Valley Baptist Medical Center. After viewing the evidence in the light most favorable to the verdict, we conclude that legally sufficient evidence exists to sustain the jury's finding that Dr. Pisharodi breached the standards of care by failing to monitor Micaela after performing the epidural steroid injection procedure, as well as failing to timely administer Narcan to reverse the side effects of the Duramorph. Appellants' fifth issue is overruled.

### 3. Causation

By their sixth issue, appellants argue that the trial court erred by failing to disregard the jury's finding that Dr. Pisharodi was negligent because the evidence conclusively established that Micaela's death was caused by a cardiac arrest due to her personal use of the prescription drug, Darvocet. We, again, disagree.

We review a trial court's denial of a motion to disregard a jury finding based on a legal sufficiency challenge de novo. *See Hall v. Hubco, Inc.*, 292 S.W.3d 22, 27–28 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Evidence is conclusive only if reasonable people could not differ in their conclusions, which is a matter that depends on the facts of each case. *See City of Keller*, 168 S.W.3d at 816. When evidence contrary to a verdict is conclusive, it cannot be disregarded. *Id.* at 817.

Appellants argue that the evidence conclusively established that the "sole proximate cause" of Micaela's cardiac arrest on October 29, 2007 was her personal, prescription use of Darvocet. While it may be true, as appellants assert, that appellees' expert witnesses did not rebut Micaela's use of Darvocet as a potential cause of her death, the fact that evidence may be undisputed does not make it conclusive evidence as to the cause of her death. *See id.* at 816 ("Undisputed evidence and conclusive

14

evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed."). Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess. *Id.* at 822.

The appellees' witnesses, Dr. Jones and Dr. Kohlmeier, each testified that Micaela died from complications related to the epidural steroid injection. Finally, appellees presented evidence of an affidavit signed by Dr. Pisharodi in which he opined within reasonable medical probability that Micaela "suffered an unpredictable and unforeseeable anaphylactic reaction to the cocktail of drugs used in an epidural injection."

We conclude that jurors were presented with conflicting evidence as to the cause of Micaela's death, and after viewing the evidence in the light most favorable to the verdict, we conclude that legally sufficient evidence exists to sustain the jury's finding that Dr. Pisharodi's breach of the standards of care proximately caused Micaela's death. Accordingly, the trial court did not err in denying appellants' motion to disregard the jury's finding of negligence against Dr. Pisharodi. Appellants' sixth issue is overruled.

## C. Summary

In summary, we conclude that legally sufficient evidence exists to: (1) hold Pisharodi Clinic jointly and severally liable in this case; and (2) sustain the jury's verdict finding that Dr. Pisharodi breached standards of care and proximately caused Micaela's death. Appellants' fourth, fifth, and sixth issues are overruled.

15

## IV.  ADMISSIBILITY OF TESTIMONY BY DR. KOHLMEIER AND DR. JONES

By their third and fourth issues, appellants assert that the trial court abused its discretion by permitting Dr. Kohlmeier and Dr. Jones to testify.

### A.  Applicable Law and Standard of Review

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.  TEX. R. EVID. 702.  Whether an expert is qualified is a preliminary question to be decided by the trial court.  *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718 (Tex. 1998).  The party offering the expert's testimony bears the burden to prove that the witness is qualified under Rule 702. *Id.*  In meeting its burden, the offering party must demonstrate that the witness possesses special knowledge as to the very matter on which he or she proposes to give an opinion.  *Id.*  We review a trial court's acceptance of a witness's qualifications as an expert for an abuse of discretion.  *Id.* at 718–19.  A trial court abuses its discretion if it acts without reference to any guiding rules or principles.  *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

### B.  Discussion

#### 1.  Dr. Kohlmeier

Appellants first argue that the trial court abused its discretion by allowing Dr. Kohlmeier to testify by deposition because her opinions regarding causation were unreliable based upon her review of incomplete medical records, an incomplete autopsy, and failing to rule out other causes of death.   We disagree.

16

Dr. Kohlmeier is a board certified forensic pathologist, clinical pathologist, and anatomic pathologist. According to Dr. Kohlmeier, forensic pathology focuses on conducting autopsies of deceased individuals and figuring out what happened to them and "how their death came about." In this case, Dr. Kohlmeier conducted an autopsy of Micaela's body pursuant to a court order issued by a Cameron County justice of the peace one day after her death. In conducting the autopsy, Dr. Kohlmeier examined Micaela externally and internally, including the examination of her internal organs, as well as the medical records from the Pisharodi Clinic and Valley Baptist Medical Center, following her collapse. Based on her complete review, Dr. Kohlmeier opined that Micaela's death was due to complications from the epidural injection, "which led to her brain, basically, not getting enough oxygen and that's why she was in a coma for a week," and the use of Duramorph played a "direct role" in Micaela's death. Furthermore, in her report, Dr. Kohlmeier noted that although the medical records "mention an anaphylactic reaction to the injection, I do not have any evidence of such." Dr. Kohlmeier also referenced Micaela's clinical history of hypertension, diabetes mellitus, hyperlipidemia, and lower-back issues, but ruled out those conditions as the cause of her death. Finally, Dr. Kohlmeier also discussed the effect Duramorph, depo medrol, and Marcaine has on the body, and opined that depo medrol and Marcaine are not known to cause cardiopulmonary arrest, but Duramorph does.

Based on this record, we hold that the trial court did not abuse its discretion in allowing Dr. Kohlmeier to testify as an expert. Dr. Kohlmeier's credentials as a forensic pathologist went unchallenged, she had knowledge of Micaela's condition following her death because she personally performed the autopsy by examining Micaela internally and

externally as well as reviewing the records provided to her from the Pisharodi Clinic and Valley Baptist Medical Center, and she ruled out other potential causes of death, including Micaela's pre-existing conditions and anaphylaxis. Appellants' third issue is overruled.

### 2. Dr. Jones

Appellants next argue that the trial court abused its discretion by admitting testimony from Dr. Jones because she "failed to do a differential diagnosis on the possible causes of [Micaela's] sudden collapse to rule out a stroke, myocardial infarction, and pulmonary embolism." Furthermore, appellants assert that Dr. Jones's testimony regarding Dr. Pisharodi's breach of the standard of care to administer Narcan to Micaela "assumed that [Micaela] received Duramorph in the face of objective evidence to the contrary and failed to review the medical evidence to rule out other probable causes of death." Again, we disagree with appellants.

Dr. Jones is a board-certified physician in anesthesiology and pain management and was retained as an expert by the appellees. In preparation for her testimony in this case, Dr. Jones noted that she reviewed the following records: (1) Dr. Kohlmeier's November 5, 2007 autopsy report; (2) medical records from South Texas Rehabilitation Hospital; (3) medical records from Valley Regional Medical Center; (4) medical records from Valley Baptist Medical Center of Brownsville; (5) medical records from Dr. Pisharodi; (6) radiology films; (7) the deposition of Dr. Betancourt; and (8) the deposition of Dr. Pisharodi. Dr. Jones noted her experience in performing "probably over 30,000" epidural steroid injections over her career, and that she continues to perform them on a daily basis. Dr. Jones noted that the use of Duramorph in these injections is not "very common" in

18

pain management, but if it is included, it should be performed in a hospital setting because of its "high incidence of delayed respiratory depression."

Dr. Jones's testimony that Dr. Pisharodi breached standards of care, including failing to monitor Micaela after the procedure and failing to administer Narcan, was based upon the medical records signed by Dr. Pisharodi on October 29, 2007 stating that he injected 4 milligrams of morphine into Micaela's epidural space. Furthermore, Dr. Jones also noted that records from the Valley Baptist Medical Center's emergency room indicate that Micaela had suffered "cardiorespiratory arrest, status post Duramorph administration via epidural in M.D.'s office," and that Narcan was administered to her because the only reason to give Narcan was because "an opiate overdose was suspected." Additionally, Dr. Jones noted further in the Valley Baptist Medical Center records that Dr. Pisharodi signed a physician's note in the records following Micaela's collapse indicating that Duramorph should be added to Micaela's list of allergies. Dr. Jones testified that in her opinion, a doctor would not list a medication allergy on a patient's chart unless it had already been given to the patient.

After reviewing this record, we conclude that the trial court did not abuse its discretion in allowing Dr. Jones to testify as an expert on the issue of whether Dr. Pisharodi was negligent in this case because: (1) her credentials as a board-certified anesthesiologist and pain management physician, who has administered tens of thousands of the injections at issue in this case, went unchallenged; (2) she testified after reviewing Micaela's complete medical records and depositions from treating physicians, including Dr. Pisharodi's; and (3) offered her opinion based upon her knowledge, skill, experience, training, and education in this case. Appellants' fourth issue is overruled.

19

## V. ADMISSIBILITY OF ESPARZA'S TESTIMONY

By his seventh and final issue, appellants assert that the trial court abused its discretion by permitting lay witness Samuel Esparza to testify over their Rule 406 objection.

### A. Standard of Review

Evidentiary rulings are committed to the trial court's sound discretion. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We will uphold a trial court's evidentiary ruling if there is any legitimate basis for the ruling. Even if the evidentiary ruling is erroneous, we will not reverse unless the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1.

### B. Discussion

Appellants argue that testimony from lay witness Samuel Esparza was improper habit evidence because "it would have been impossible for [Esparza] to know what was done as a matter of routine with all of Dr. Pisharodi's patient[s] from his one and only encounter as a patient."

> Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion, the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.

TEX. R. EVID. 406.

Esparza was a patient in Dr. Pisharodi's office on October 29, 2007 along with Micaela. Esparza testified about what he observed and experienced that day as a patient, including what he heard and saw after Micaela's collapse, and the extent of care that Dr. Pisharodi provided to Esparza. Appellees' counsel's direct examination was

20

relatively short and involved facts related to Esparza's observations as a patient. Therefore, we disagree that Esparza's testimony equated to inadmissible habit evidence, and we hold that the trial court did not abuse its discretion in allowing Esparza to testify. Appellants' seventh issue is overruled.

## VI. CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES,
Justice

Delivered and filed the
19th day of November, 2015.